## TALBOT v. UNITED STATES.*

(Circuit Court of Appeals, Seventh Circuit. December 6, 1922. Rehearing Denied January 23, 1923.)

No. 3103.

1. **Criminal law ☞1159(2)—Judgment affirmed, when essential intent could be fairly found.**

Where a prosecution for persuading, inducing, and enticing a woman to go from one state to another for the purpose of debauchery was before the jury on controverted questions of fact, if there was evidence from which the required intent could be fairly and reasonably found, the judgment will be affirmed.

2. **Prostitution ☞4—Evidence held to support conviction for inducing interstate travel for purpose of debauchery.**

Under the rule that a man is presumed to intend the reasonable and probable consequences of his acts, evidence *held* sufficient to support a conviction for persuading a woman to go from one state to another for the purpose of debauchery.

In Error to the District Court of the United States for the District of Indiana.

John W. Talbot was convicted of an offense, and he brings error. Affirmed.

C. C. Shirley, of Indianapolis, Ind., for plaintiff in error.

Frederick Van Nuys, of Indianapolis, Ind., for the United States.

Before BAKER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. This appeal is to reverse a judgment on a general verdict of conviction, under the first three and the fifth counts of an indictment, one of which counts charges that defendant did knowingly persuade, induce, and entice Pearl Bagley to travel in interstate commerce for the purpose of debauchery.

[1] It is urged that the record shows no evidence that, at the time of the transportation, there was an intent or purpose to induce Pearl Bagley to travel from Kansas to Indiana for the unlawful purpose charged. The case was before the jury on controverted questions of fact, and if the record contains evidence from which the intent could have been fairly and reasonably found by the jury, the judgment must be affirmed. Applebaum v. U. S. (C. C. A.) 274 Fed. 43.

[2] Defendant Talbot was Supreme President of the fraternal Order of Owls. Though having a home in South Bend, and a wife who, he wrote Pearl Bagley, was healthy, a woman of remarkable mentality and charming personal appearance, he seems not to have lived with this remarkable and charming wife much, if at all, but took into his house

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 43 Sup. Ct. 518, 67 L. Ed. —.

and lived with one Pearl Spangler, who says that their relations had continued for 15 years. Both Talbot and the woman were so brazen about it that they published his house address and telephone number as her house address and telephone. He also lived some of the time on a farm near Niles, Mich., with one Helen Bartlett, who was neither a relative nor a servant. This uncontradicted state of the record shows that, when Talbot concluded his letter of September 4, 1920, to the father of Pearl Bagley, with the inquiry, "By the way, how is Miss Bagley?" he was grossly immoral and unrestrained by any law in his relations with women.

Miss Bagley, to Talbot's inquiry made of her father, on September 8, 1920, replied personally, in a free, gossipy, and personal vein. She confessed:

"I am still sentimental over the O. of O. pillow, that you will probably remember having sent me just after your return to South Bend."

She also inquired about his wife and son. That letter seems to have suggested some sort of possibilities to Talbot, because on the very day it was received, September 10th, he wrote to "Dear Miss Bagley," expressed pleasure that she still cherished his former present, and made that a justification for sending her another present, and asked:

"Can't you spend your vacation here this time? I will take care of the hotel and other expenses, and I believe you will enjoy it. * * * You have never been in this vicinity. I will turn over to you one of most charming of office assistants to look after you, and we will certainly give you a good time. * * * Can't you do it?"

The only thing suggested in connection with business was:

"You can take back to your father some information concerning the Order of Owls that will start him making money."

But the letter from Talbot was personal, the expenses were to be paid by him, and the "charming" attendant was to be given by him. In the letter he confidentially informed her of the 20-year estrangement between him and his wife, discussed his son in a very personal way at some length, and wound up,

"Keep me in mind, and send me something from time to time. I am putting you on the subscription list of the Owl permanently.
    "Sincerely,                                    John W. Talbot."

With that letter he sent his picture. Miss Bagley replied on September 22d. While that letter is not in the record, we can read in Talbot's reply, written immediately after its receipt, September 24th, some of its contents. Evidently she accepted his invitation, and he gave her in his letter of the 24th further assurance of what he would do for her:

"I expect to endeavor to make your stay in this part of the country interesting, and to see to it that you learn something of our district and our way of living. As to the finances, we will handle those upon your arrival. * * * In the meantime, dear Miss Bagley, keep me in mind, and come whenever you are disposed. Please wire at my expense a few days before you arrive here, so that there will be no question but that you will be properly met and cared for.
    "Your sincere friend,                                    Talbot."

Whether there was something in Miss Bagley's letter putting an interpretation upon the boldness and generosity of Talbot's letter of the 10th does not appear. In any event, the following, in his letter of the 24th, could have no proper place or purpose in the second letter to a woman from a man who had met her but once and that 15 years before:

"I don't want you to harbor any erroneous impression concerning me. I am not showing any streak of generosity, and you know from your meeting with me I am no cad, and am not seeking in any roundabout way to be offensive. Your visit will be to me worth all that it costs, and I trust that to you it will be worth all the time that you spend."

This was followed by some indefinite and uncertain expressions, presumably intended to induce Pearl Bagley to believe that she, after a talk with him, Talbot, would be the influence that would put the Order of Owls in a commanding and influential position in the West. We find nothing in the record inducing the belief that this suggestion about business was made in good faith, or for any other purpose than to give Pearl Bagley false notions and to deceive and mislead her. There was no possible basis for a belief that she would be the person who would or could exercise the influence on the destinies of the Order of Owls which the letter was evidently intended to make her believe he thought she could or would.

On October 5, 1920, Talbot, in reply to a telegram of that date from Pearl Bagley, wired her, upon her arrival in South Bend, to come directly to his office, where he would be waiting, which she did. She was not taken to a hotel, but was turned over by Talbot to Pearl Spangler and taken to stay at the Owls' hospital, where Pearl Spangler was in charge, but where there were no patients. From his personal relations with Pearl Spangler and checking his other employés against their ages and marital relations shown in the record, it appears that Pearl Spangler must have been the "most charming of office assistants" selected and referred to in Talbot's letter to Pearl Bagley of September 10th. Men went to the hospital and had improper relations with Pearl Spangler and Pearl Bagley. Pearl Spangler took Pearl Bagley to Chicago, and they both had improper relations with strangers at a hotel.

In Athanasaw v. United States, 227 U. S. 326, at page 331, 33 Sup. Ct. 285 at page 287 (57 L. Ed. 528, Ann. Cas. 1913E, 911), the Supreme Court sustained an instruction which told the jury that:

"The term 'debauchery,' as used in this statute, has an idea of sexual immorality; that is, it has the idea of a life which will lead eventually or tends to lead to sexual immorality, not necessarily drunkenness or immorality; but here it leads to the question in this case as to whether or not the influences in which this girl was surrounded, by the employment which they called her to, did not tend to induce her to give herself up to a condition of debauchery which eventually, necessarily, and naturally would lead to a course of immorality sexually."

There is abundant evidence to show that Talbot, after inducing Pearl Bagley to come to Indiana, immediately surrounded her with the worst of associations, that were calculated, if she could be influenced at all, to lead ultimately to the debauchery which followed. On the presumption that a man must be held to intend the reasonable and probable con-

sequences of his acts (16 Corpus Juris, p. 81), we find abundant evidence in the record to warrant the conviction.

Talbot wrote two letters to William Bagley, the father, on October 13th and 15th, respectively. The first was written the day after the happenings at Talbot's office related by Pearl Bagley, and the last the day after the return of Pearl Bagley and Pearl Spangler from Chicago, where both of them agree substantially as to their wrongful conduct there. It may be presumed that the Spangler woman kept Talbot advised as to the progress of his visitor in immorality. In any event, whatever he knew regarding the Bagley girl seemed to be pleasing to him. In the letter of the 13th he speaks of her as "Pearl," and says, "She is in good health, and I believe thoroughly enjoying herself," and speaks of the "great liking" his mistress had for Bagley's daughter. The next letter, following the return from Chicago, reads:

"I think we will keep her here a long while. She had better stay here than to go to Kansas, until next spring or later."

Unless he knew what she was doing, why should he desire her to stay "a long while"? The record discloses no other reason. It seems to us that he could not have written those letters without a knowledge of the wrongful conduct of the girl, and that, if that wrongful conduct was not a part of what he had intended when he induced her to come there, he would, for many reasons, have sought to shorten and not prolong her stay.

The cases most strongly relied upon by the defendant are not out of harmony with the conclusions here reached. In Rizzo v. United States (C. C. A.) 275 Fed. 51, the court held that the offense charged was completed before the defendant in question knew anything about it, and an analysis of that case will show that the facts are wholly unlike those in the record here. In Fisher v. United States (C. C. A.) 266 Fed. 667, the court said:

"On her testimony and related circumstances the jury were amply warranted in finding" transportation "by the defendant in interstate commerce for the purpose prohibited by the act."

But the case went off on what the court regarded as an improper instruction, which, in effect, told the jury that the mere fact of a journey from one state to another, followed by the commission of the offense prohibited by the statute, but the taking of which journey had no relation whatever to the commission of the offense, was wrong.

The judgment is affirmed.